**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**BOWLING GREEN DIVISION**

| | |
|---|---|
| **FLAVIEN MICHEL CLAUDE PERIGAUD,** )<br><br>**Petitioner/Father,** )<br><br>**v.** )<br><br>**VICTORIA ALEXANDRIA COLLINS**<br>**PERIGAUD,** )<br><br>**Respondent/Mother.** ) | **Case No.** 1:23-cv-175-GNS |

---

### PETITION FOR RETURN OF MINOR CHILDREN TO PETITIONER

Petitioner, Flavien Michel Claude Perigaud ("Father"), requests an order for the return of his three minor children to their habitual residence of France. In further support of this Petition, Father states as follows:

#### PREAMBLE

1.     This Petition is brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction done at the Hague on 25 October 1980 ("The Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C.S. § 9003(b).

2.     The Convention went into effect in the United States on July 1, 1988, and it has also been adopted by France, entering into force in that country on December 1, 1983.

3.     For the convenience of the Court, a copy of The Convention and ICARA are attached as **Exhibits A and B**, respectively.

4.     The objects of the Convention are:

1

      (a)     to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

      (b)     to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.[1]

5.      "The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children." Article 11, The Convention.

6.      A court's role in deciding petitions filed pursuant to the Hague Convention and ICARA is to determine only rights under the Convention and not the merits of any underlying child custody claims. *See* Article 19 of The Convention; 22 U.S.C.S. § 9001(b)(4).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to Article 12 of The Convention and 22 U.S.C.S. § 9003. Specifically, jurisdiction under the Hague and ICARA exists where the children are currently located, despite being wrongfully retained there by one parent without the consent of the other parent.

8.      In this case, the Respondent, Victoria Alexandria Collins Perigaud ("Mother"), wrongfully removed the parties' three minor children from France to Monroe County, Kentucky, on or about August 31, 2023, and retains them there without the consent, and over the objection, of Father.

---

[1] The Convention authorizes a U.S. District Court to determine the merits of the Hague petition alleging an abduction and/or wrongful retention but does not allow that court to consider the merits of any underlying custody disputes. *Friedrich v. Friedrich ("Friedrich I")*, 983 F.2d 1396, 1400 (6th Cir. 1993) ("a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court").

9.      Venue is proper in this Court, as Monroe County, Kentucky is contained within the Bowling Green Division of the United States District Court for the Western District of Kentucky.

10.     This Petition is filed within one year of the date of the wrongful removal and retention of the children by Mother.

**LEGAL STATUS AND WHEREABOUTS OF CHILDREN, FATHER, AND MOTHER**

11.     Father and Mother were married on October 18, 2008, in Saint Lyphard, France.

12.     Father is a French citizen, domiciled in Marquette-Lez-Lille, in the Nord department in northern France. He is the biological father of the three children subject to this Petition.

13.     Father does not have a criminal record. *See* Certification of Criminal Records, attached as **Exhibit C**.

14.     Mother is an American citizen and the biological mother of the children who are the subject of this action. A redacted copy of Mother's passport is attached as **Exhibit D.**

15.     The children subject to this Petition are: GNP, age 13 at the time this Petition was filed; AEP, age 9 at the time this Petition was filed; and AWP, age 2 at the time this Petition was filed. The children are under the age of sixteen, for purposes of The Convention.

16.     GNP was born in Cork, Ireland; AEP was born in Hendersonville, Tennessee; and AWP was born in Chatellerault, France. Each of the three children are dual citizens of France and of the United States of America, and each were born during the parties' marriage.

17.     A redacted copy of GNP's Birth Certificate and Certificate of Birth Abroad is attached as **Collective Exhibit E**; a redacted copy of AEP's Birth Certificate is attached as

**Exhibit F**; and a redacted copy of AWP's Birth Certificate and Certificate of Birth Abroad is attached as **Collective Exhibit G**.

18.     Prior to being abducted to Monroe County, Kentucky by Mother, the children lived in France for the last five (5) consecutive years, since 2018, together with Father and Mother.

19.     Upon information and belief, Mother is currently retaining the children at an address in Monroe County, Kentucky, and can be served with process at that address.

### THE CHILDREN'S HABITUAL RESIDENCE IS FRANCE

20.     The children have been habitual residents of France for the last five (5) consecutive years, since 2018, within the meaning of Article 3 of the Convention.

21.     Prior to Mother wrongfully removing the children to and retaining them in the United States, the children's lives were in France.

22.     The children still have family in France. Not only has their Father been left behind in France, but the children also have their paternal grandparents, three great grandparents, two aunts, two cousins (7 and 10 years old), and many second cousins in France. Prior to being wrongfully removed from France by Mother, the children had strong emotional bonds to each of these family members.

23.     The children also have school friends and family friends in France.

24.     The children speak French, in addition to English, as one of their primary languages.

25.     The two older children were enrolled in school in France, and were receiving a good education. *See* Proof of Enrollment in School and English Translations (redacted), attached as **Collective Exhibit H**.

26.     The two older children were involved in various sports and activities in France,

4

including martial arts, skating, dance, and fencing.

27.     The children's home and belongings are located in France.

28.     The children are rooted, integrated, and settled into their home in France.

29.     A French court has specifically found France to be the children's habitual residence. *See* November 3, 2023, Orientation and Interim Relief Order issued by the French court, at pp. 8, 10, and 16, the certified English translation and French version (with Apostille) are attached as **Collective Exhibit I**.

### FATHER HAS RIGHTS OF CUSTODY AND ACCESS TO THE CHILDREN UNDER FRENCH LAW, PURSUANT TO THE CIVIL CODE AND EVIDENCED BY THE INTERIM CUSTODY ORDER ISSUED BY THE FRENCH FAMILY AFFAIRS JUDGE

30.     Father has the rights of custody and access to the children, who are the subject of this action, within the meaning of Articles 3 and 5 of The Convention, in that he is the biological father of the children and, therefore, has the right to exercise legal custody, or parental authority, jointly with Mother under the laws of France.  *See* Legal Opinion Regarding Custody by Diane Sussman, attached as **Exhibit J**; November 3, 2023, Orientation and Interim Relief Order issued by the French court, **Collective Exhibit I** at pp. 13-17; *see generally,* Article 372 of the French Civil Code.

31.     Parental authority "is a cluster of rights and duties whose finality is the interest of the child; it is vested in the father and mother until the majority or emancipation of the child in order to protect them in their safety, health and morality, to ensure their education and allow their development, with all due respect owed to their person." November 3, 2023, Orientation and Interim Relief Order issued by the local French court, **Collective Exhibit I** at pp. 13; *see also*, Legal Opinion Regarding Custody by Diane Sussman, attached as **Exhibit J**, pp. 3; *see generally,* Article 372-1 of the French Civil Code.

5

32.      French law gives both parents the right to "participate equally in the care of the child," and "a divorce has no impact on the rules governing the devolution of parental authority." Legal Opinion Regarding Custody by Diane Sussman, attached as **Exhibit J**, pp. 3.

33.      French law requires both parents to "respect the child's ties to the other parent." *Id*.

34.      "Parental authority under French law entrusts parents the right to decide their children's place of residence." *Id*. at p. 4.

35.      Article 372-2-9 of the French Civil Code provides that physical custody (or the "residence") of a child "can be fixed on an alternating basis at homes of both parents or at the home of one of them." November 3, 2023, Orientation and Interim Relief Order issued by the French court, **Collective Exhibit I** at p. 14.

36.      The French court has entered an Interim Order specifically awarding legal custody, or parental authority, exclusively to Father. *See id*.

37.      In making this determination, the French court found: "In this case, [Mother], who has taken the three children out of the European Community and who has therefore taken them out of school for more than a month, has deliberately broken the emotional and material ties binding them to their father. [Mother] made a unilateral decision that goes against the interests of the children, by deliberately taking them away from their father and brutally removing them from their familiar environment. She has shown herself to be incapable of respecting the fundamental rules of co-parenting and of making decisions consistent with the interests of the children." *Id*.

38.      The French court's Interim Order also specifically awards physical custody to Father. *See id*. at p. 16.

39.      The French court provided a lengthy rationale for awarding physical custody of

the children to Father. *See id*. at pp. 14-16.

40.     Specifically, the French court found: "the children's habitual residence was established in France by mutual agreement of the parents and that they had been living there on a regular basis since 2018." *Id*. at p. 16.

41.     The French court further found: "both parents exercised parental responsibility and therefore had joint legal custody of the children, as no court orders had been made to decide the legal and physical custody of the children before they were taken to the United States. This removal, decided unilaterally by the mother, has an excessive adverse impact on the family, social and cultural balance of the children, who were supposed to be going back to school after the summer and who were deliberately taken out of school for a month by their mother." *Id*.

42.     Finally, the French court found: "The higher interests of the child require that care be taken to ensure that they maintain personal relations with each of their parents. The sudden departure of [Mother] with the three children has led to an unprepared breaking off of the ties between the father and the children, this break constituting a traumatic event contrary to the children's interests and well-being. In addition, they have moved in with a family that they do not know, and with whom they have never lived, whereas they had all their ties in the Nord region of France." *Id*.

## FATHER WAS EXERCISING HIS RIGHTS OF CUSTODY AND ACCESS AT THE TIME OF THE REMOVAL

43.     Prior to and at the time of the wrongful removal by Mother, Father was exercising his rights of custody and access within the meanings of Articles 3 and 5 of the Convention.

44.     Father shared in the day-to-day parenting responsibilities of the children and did more than half of the cooking, laundry, cleaning, and ironing for the family.

45.    Father also spent time interacting with the children any time he could. He played board games with AEP, played video games with GNP, blew bubbles with AWP, read in French with AEP at night, watched AEP and GNP participate in various sports and activities, supervised AEP's and GNP's studies, and attended all school meetings for the children. Father spent time with the family at the park or playground almost every weekend—usually carrying AWP or pushing him in the stroller, participated in family vacations with the children, and—along with Mother—took the children to experience amusement parks and other special events. *See* Photos of Father with the children in the months immediately prior to Mother's wrongful removal of them to the United States, attached as **Collective Exhibit K**.

46.    Father also exercised his joint parental authority over the children by weighing in on decisions related to the children's involvement in extracurricular activities, education, health, and religion.

47.    Father further participated in decision-making regarding where the children should reside. Prior to removing the children from France, Mother relentlessly pressured Father to move to the United States. Father never consented, nor agreed to the proposed move. In fact, in response to Mother's message dated July 13, 2023, in which she requested that Father give a move to the United States a "try", he wrote: "A try? You are playing with everyone's life and stability. This is a try that involves a lot of risk and headache." *See* Messages Between the Parties, attached as **Exhibit L**.

48.    Father works for Berry Global as a customer service manager and makes adequate income that has allowed him to provide financial support for Mother, as well as for the children throughout their lives. In France, Father paid for the mortgage, household bills, medical care, clothing, footwear, household supplies, school expenses, and extracurricular activities.

8

49.     There can be no doubt that Father was exercising his custodial rights and access to the children. Not only is Father the main income provider for the family, but Father was also an involved parent for all of the children's lives.

## THE ABDUCTION

50.     Mother is currently staying in Monroe County, Kentucky, with the children. Upon information and belief, they are staying with Mother's foster family from when she was a child. Father has not consented to or acquiesced to the children being removed from France and, consequently, being taken away from their father, extended family members, friends, school, activities, and home.

51.     Throughout the parties' marriage, which occurred in France, Mother would frequently grow dissatisfied and would insist on a change of scenery. In an effort to make Mother happy, Father agreed to several moves throughout the course of the parties' relationship. Prior to moving back to France in December of 2018, the parties lived in France from August 2008 to February 2010; Ireland from February 2010 to May 2012 (GNP was born in Ireland); Tennessee from May 2012 to October 2016 (AEP was born in Tennessee); Ireland from October 2016 to December 2018; and France consistently from December 2018 until Mother unilaterally uprooted the children from their home and moved them to Monroe County, Kentucky on or around August 31, 2023 (AWP was born in France).

52.     When the parties moved back to France in December of 2018, Father wanted this move to be permanent, as his family and his work were located in France. Mother agreed. In fact, when the parties moved from Chatellerault, France to Lille, France (a bigger city), Mother stated that she wanted to purchase a house, rather than rent a house. When Father pointed out the number of times the parties had moved, Mother said "this is our permanent place, let's buy a home here."

The parties did, indeed, purchase a home in the north of France together.

53.     Father believed that settling in France would provide the children with opportunities, stability, and predictability.

54.     In January of 2023, Mother's foster family traveled from Kentucky to visit the parties and the children in France. Following that visit, Mother again grew dissatisfied and raised the idea of relocating the family to the United States. By the Spring of 2023, Mother had become obsessed with the idea of relocating the family to the United States. She bombarded Father with messages about this topic daily. *See* Messages Between the Parties Regarding Mother's Desire to Relocate, attached as **Collective Exhibit M**[2]; *see also*, **Exhibit L**.

55.     Because of the sheer volume of the messages and because he was often at work when Mother sent them, Father did not respond to many of these message. *See id.* However, Father did make his objection to this proposed move known to Mother on several occasions both in writing and in conversation. *See id.*

56.     For example, Father told Mother: "I feel distant because I am not thrilled about the idea of going back to the US that's it." *Id*. Also, in response to Mother's comment that she thought a move "will be good for everyone", he said: "Not sure. Sounds very stressful." *Id*. He also expressed concerns about having a place to live and a salary that could compete with the salary he was earning in France. *See id*. Additionally, Father communicated that he was "tired of resetting our life so many times." *Id*. He also stated to Mother: "You are not alone. You make yourself feel alone because you obsess so much about moving to the US." *Id*.

_____

[2] In these same messages, Mother tries desperately to convince Father to move to the United States with her and the children. She also expresses her love and affection for Father. These messages undermine Mother's domestic violence allegations and call into question her credibility.

57.     Father did not agree to move to the United States, nor did he agree for Mother to move with the children to the United States. Father simply did not think moving to the United States was in the children's best interests.

58.     Eventually, Mother's incessant requests to move the family to the United States became a colossal point of contention in the parties' relationship, and Mother decided to take matters into her own hands.

59.     On the morning of August 31, 2023, the children were still asleep when Father was getting ready to leave for work. Mother told Father that she loved him and gave him a kiss before he walked out the door. Father returned from work that evening around 6:30 p.m., and Mother and the children were not home. He thought that was odd, since Mother did not work and she and the children were usually home when Father returned from work in the evenings. However, Mother had listed a playdate for the children on the family calendar, so he sent her a text message asking what time they were coming home. He then called Mother twice. He did not receive a response to his text or his phone calls. *See* Screenshots of Messages and Attempted Calls from August 31, 2023, to September 26, 2023, attached as **Collective Exhibit N**.[3]

60.     After some time at home, Father noticed that he could not find the family cat (who is an indoor cat), which set off alarm bells. He then discovered that all of the important documents, including his passport, the children's birth certificates and passports, and Mother's passport had been taken.  Father's iPad was also missing. Father filed a police report regarding theft of these items. *See* Redacted French and English Versions of Police Report, attached as **Collective Exhibit**

---

[3] This text message is evidence that Father had not agreed for Mother to take the children out of France, as he believed they were coming home.

**O**.[4]

61.     Realizing that Mother had likely abducted the children, Father became panicked and began efforts to locate the children. He texted and called GNP, who did not respond. *See* Messages from Father to GNP, attached as **Collective Exhibit P**. Father called his younger sister, who got on a train to come assist him with his search, and reached out to mutual friends in the hopes that they knew where Mother and the children were. He also blocked the card from the joint bank account in an attempt to keep Mother from booking a plane ticket or other transportation for herself and the children out of the country. He then went to the police station to report what happened. All of Father's behavior is consistent with a parent who did not give consent to the other parent to leave the country with their children.

62.     On September 6, 2023, Father was notified by a WhatsApp notification that Mother had changed her phone number to a +353 prefix, which is Ireland's country code.

63.     Since GNP's and AEP's passports had expired (only AWP had a valid passport at the time), Mother went to Ireland in order to have new passports issued for the children from the Dublin embassy.

64.     Father promptly notified the Department of State for the United States to alert it to the fact that an abduction appeared to be in progress. *See* Father's September Correspondence with State Department, attached as **Collective Exhibit Q**. This correspondence clearly demonstrates Father was not in agreement for the children to be taken to the United States.

65.     Father enrolled the children in Children's Passport Issuance Alert Program

---

[4] He later dismissed his complaint for theft, so that Mother would not have any criminal charges pending if she were to return with the children to France.

(CPIAP) with the Department of State. *See id*. In doing so, Father repeatedly begged that new passports not be issued for the children. For example, on September 6, Father said: "If my partner ever tried to come to the embassy to request a passport for my children, **could you please ensure that it would not be issued under any circumstances, as being the birth father of the children, I strictly oppose it**." *Id*. Then, on September 7, 2023, Father stated: "I strictly oppose the issuance of passports for my children." *Id*. In these emails, Father also expressed concern about the children's safety. *Id*.

66.    On September 7, 2023, the U.S. State Department confirmed Father's objection to new passports being issued and further stated that the pending applications for new passports, submitted by Mother, were suspended. *Id*.

67.    The U.S. State Department again confirmed the applications were in suspended status on September 8, 2023, and September 13, 2023, in response to Father's inquiries regarding the same. *Id*.

68.    Father continued to be in contact with the U.S. State Department regarding the status of the passport applications, as well as the fact that the whereabouts of the children were still unknown. *Id*.

69.    On September 20, 2023, the U.S. State Department gave Father the concerning news that passports had been issued for the children over his objection. *See* September 20, 2023, Email Correspondence Between Father and State Department, attached as **Collective Exhibit R**.

70.    Based on the requirements listed in C.F.R. 51.28, which governs when a passport can be issued for a child without consent of both parents, Father believes Mother was untruthful in the applications for passports for the children.

71.    Throughout all of this, Mother refused to communicate with Father and cut off all

contact between Father and the children.

72.     The nature of Mother's actions demonstrate that Father was not in agreement with her plan to leave France with the children.

73.     Upon information and belief, Mother entered the United States with the children on September 20, 2023.

74.     Father sought assistance from the French Central Authority by making a Hague application for return of the children to Father in France. The French Central Authority forwarded this application to the U.S. Central Authority. A redacted English translation copy of Father's Request for Return on file with the U.S. Central Authority is attached as **Exhibit S**.

75.     The fact that Father sought assistance from the French Central Authority and the U.S. Central Authority is further evidence that he did not consent or acquiesce to the children's removal to or retention in the United States.

76.     On or about November 8, 2023, the United States Department of State sent a letter to Mother informing her that Father has filed for return of the children through the Central Authority.

77.     In addition to utilizing resources through the U.S. State Department, the French Central Authority, and U.S. Central Authority, Father also filed for divorce and custody in France on September 14, 2023. He asked for those proceedings to be expedited in light of Mother's apparent abduction of the children. A hearing was held on October 13, 2023. Father was in attendance with his counsel. Mother did not appear, despite there being nothing preventing her from appearing, but a lawyer did represent her interests. As a result of that hearing, the French court issued its November 3, 2023, Orientation and Interim Relief Order. *See* **Collective Exhibit I**.

78.     As set forth more fully on pages 6 and 7 of this Petition, the French court's Interim Order specifically awards legal and physical custody exclusively to Father. *See id*. Again, the basis for this ruling was Mother's unilateral decision, which was not in the children's best interests, to remove the children from France and to bring them to the United States without Father's consent. *See id*. at p. 14.

79.     To date, Mother has refused to return the children therefore necessitating the filing of this Petition for Return.

80.     As evidenced by all of his actions, Father strongly objects to the children remaining in the United States.

### WRONGFUL REMOVAL AND RETENTION OF CHILDREN BY MOTHER AND KENTUCKY PROCEEDINGS

81.     "The removal of a child from the country of [his or her] habitual residence is 'wrongful' under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law at the moment of removal." *Friedrich v. Friedrich ("Friedrich II")*, 78 F.3d 1060, 1064 (6th Cir. 1996); *see Prevot v. Prevot*, 59 F.3d 556, 558 (6th Cir. 1995).

82.     As discussed above, Father has rights of custody and access to the children within the meaning of The Convention and 22 U.S.C.S. § 9001, *et seq.*, pursuant to the French Civil Code and the French court's Interim Order. *See* **Collective Exhibit I** at pp. 14-16.

83.     There can be no doubt that Father was exercising his rights of custody of and access to the children immediately prior to their wrongful removal and retention by Mother.

84.     As such, Mother's decision to remove the children to Kentucky without Father's consent is a wrongful removal of the children within the meaning of The Convention and/or 22

U.S.C.S. § 9001, *et seq.*

85.    Further, Mother continues to wrongfully retain the children, within the meaning of The Convention and/or 22 U.S.C.S. § 9001, *et seq.,* by refusing to return the children to the country of habitual residence—France.

86.    In doing so, she is deliberately interfering with the relationship between Father and the children and preventing Father from exercising his rights of custody and access. *See also*, pages 15-17 of this Petition.

## KENTUCKY STATE COURT PROCEEDINGS AND MOTHER'S CONTINUED EFFORTS TO SEVER THE RELATIONSHIP BETWEEN FATHER AND THE CHILDREN

87.    Mother has improperly attempted to establish jurisdiction in Monroe County, Kentucky in a desperate attempt to retain the children there over Father's objection.

88.    First, on September 29, 2023, the court in Monroe County, Kentucky issued an Emergency Protective Order against Father at Mother's request. This Order was entered without notice to Father and without Father's ability to participate in a hearing on the merits. Not only that, but the allegations made by Mother against Father were untruthful. Second, on October 9, 2023, after Father had already filed for divorce in France, Mother filed a Complaint for Divorce in Monroe County, Kentucky. In that pleading, she admits that neither she, nor the children, have been residents of Kentucky for more than 180 days.

89.    A hearing on the Emergency Protective Order was set for October 19, 2023. In advance of that hearing, Father's attorney entered a limited and special appearance and filed a Motion to Dismiss both the Emergency Protective Order and the Complaint for Divorce for lack of personal jurisdiction. Father maintains that the state of Kentucky does not have personal jurisdiction over him and that France is the proper jurisdiction in which to decide any issues related

to custody of the minor children.

90.     At the hearing on October 19, 2023, the Kentucky court continued the matter, including Father's Motion to Dismiss, to November 9, 2023.[5] *See* Kentucky Order Entered on October 24, 2023, attached as **Exhibit T**.  In the meantime, the court ordered Mother to place the current and valid passports for the three children in a sealed envelope and turn them over to the Monroe Circuit Clerk to be retained by the court until further order.[6] *See id.* The court also loosened the restrictions of the Emergency Protective Order by further ordering that Mother make the children available for a 30 minute video visitation, via Zoom, with Father every Saturday from 12:00 p.m. to 12:30 p.m. central time. *See id.* Pursuant to this Order, Mother is also required to provide Father the Zoom link for each visit by noon every Friday. *See id.*[7]

91.     On November 9, 2023, the Kentucky court heard argument on Father's Motion to Dismiss the Complaint for Divorce and Emergency Protective Order, but requested additional briefing on this issue. Also, still pending in the Kentucky court is Father's request to register the French Interim Order and his motion to "immediately enforce the French Court's custody determination of November 3, 2023, KRS 403.846, and transfer physical custody of the children

---

[5] The Kentucky court heard argument on Father's Motion to Dismiss for Lack of Personal Jurisdiction on November 9, 2023, but has requested additional briefing on this issue.

[6] Mother did not timely deliver the passports, and it took extraordinary efforts to get the children's passports deposited with the Clerk. Mother actually wrote a letter to the court saying she was busy. Ultimately, Samantha Collins, not Petitioner, was the one that took the passports to the Clerk. Nevertheless, the passports are now currently in the court's possession.

[7] After technical glitches, the parties' respective counsel agreed to use a continuing link—instead of a new link each week—in an effort to simplify the process. They also agreed to slightly modify the visitation time to 1:00 p.m. to 1:30 p.m., instead of from 12:00 p.m. to 12:30 p.m. Nevertheless, Mother continues to hinder and prevent Father from exercising his Zoom visitation with the children.

to their Father to prevent further emotional damage to them." This motion, which Father filed pursuant to the UCCJEA in an effort to have his children returned to their home in France, has not yet been heard by the court.[8]

92.    The Kentucky Order entered on October 24, 2023, is still in effect; yet, Mother has been sabotaging the 30 minute weekly visits the children are entitled to have with Father each week. *See* **<u>Exhibit T</u>**. In fact, after the first 30 minute visit, there were no further visits that complied with the Kentucky Order, and sometimes no visit at all.  On some occasions, Mother's tactic has been to plan the children's lunch during the 12:00 p.m. to 12:30 p.m. visitation time frame in order to distract them from speaking to Father and to cut the conversation short. On other occasions, Mother (or Samantha Collins, who was Mother's childhood foster parent) points the camera at a field and purports to call the children over, but they do not appear on the screen.  It has become obvious to Father that the children are not anywhere near the field where the camera is being focused.  If they were, the camera would be pointed at them with the children visible to their Father and vice versa.

93.    One could conclude that Mother has sabotaged these visits because the children could not be coached enough by the time the first visit occurred to keep them from stating their true feelings.  Specifically, during the first Zoom visitation, GNP and AEP both separately said they wanted Father to come to the United States, and AEP said she missed him. These statements did not fit the narrative contrived by Mother that she and the children fled France because they were victims of domestic violence.

_____

[8] Father agrees the Kentucky court has jurisdiction to *enforce* the French Interim Order, but disputes the Kentucky court has jurisdiction to issue any custody orders concerning the children. This Court has jurisdiction over this Hague Petition.

94.     Not only does Mother persist in wrongfully retaining the children in Kentucky, despite Father's request for their return to France, but she is also denying Father *any* meaningful access to his children. This is true despite: 1) the Kentucky Order requiring her to allow him to have at least some contact with the children; and 2) the French order awarding Father exclusive physical and legal custody of the children.

95.     Moreover, Father has not seen his children in person in more than three (3) months as of the date this Petition was filed.

96.     Based on these facts, Father requests that this Court also order immediate and regular access to his children, which is permitted and governed by The Convention and ICARA, while this action is pending. *See* Article 21, The Convention.[9]

97.     Father also requests this Court to restrain and enjoin Mother from removing the children, or permitting the children to be removed, from the jurisdiction of this Court while this action is pending. Additionally, Father requests that the Court order the children's passports to remain in the custody of the Monroe County Clerk until further order of *this Court*, or order of the Monroe County court releasing the passports *only* to Father or his agents.[10]

98.     "After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained *shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention*…" Article

---

[9] "In furtherance of the objectives of…the Convention…[this Court] may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition." 22 U.S.C.S. § 9004(a) (2014).
[10] *Id.*

16, The Convention (emphasis added).  For this reason, any and all state court proceedings related to the children, other than Father's Motion to Dismiss and Motion to Enforce, should be stayed until this Court determines this Petition.

### FATHER MEETS THE PRIMA FACIE ELEMENTS FOR RETURN OF THE CHILDREN, AND NO VIABLE AFFIRMATIVE DEFENSE EXISTS TO RETURN

99.     "Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." Article 12, The Convention. This is the case here.

100.     The facts of this case prove that each and every element of Father's prima facie case under The Convention and ICARA have been met.

101.     Furthermore, Mother cannot prove any affirmative defense in this case.

102.     This Petition has been filed within one year of the children's removal from France.

103.     Father did not consent to the removal to, or retention of, the children in the United States.

104.     None of the children are of sufficient age and maturity to raise an objection to return. This is especially true in light of the clear manipulation and alienation Mother has engaged in with respect to the children.

105.     Returning the children to France would not subject them to violation of basic human rights and fundamental freedoms.

106.     There is no grave risk that the children's return would expose them to physical or psychological harm or otherwise place them in an intolerable situation.

107.    The children are not at social or economic risk in France. In France, the children have access to food and medical treatment, there has not been an outbreak of disease, and the children, if returned, would not be exposed to a zone of war.

108.    Based on Mother's allegations in other court proceedings that have occurred *after* August 31, 2023, when she abducted the children, Father anticipates that Mother will contend that she and the children were victims of domestic violence. These serious allegations are Mother's desperate attempt to get her way and to escape the consequences of her unlawful actions.

109.    Mother's allegations of abuse are not credible. The very first allegation of abuse occurred when she made a police report to the authorities in Paris, France, on August 31, 2023— the day she abducted the children. She was clearly setting up her defense, as she had never made an allegation of abuse against Father before. She then requested an Order of Protection from the Kentucky court, rather than pursue resources available to her in France. In fact, France has very favorable laws to protect victims of domestic violence. *See* November 29, 2023, Legal Opinion Regarding Domestic Violence Protections rendered by Diane Sussman, attached as **Exhibit U**. This behavior is suspicious, to say the least, especially when compared with the text messages Mother sent to Father begging him to relocate the family to the United States.

110.    Now, we are seeing Mother's escalating efforts to justify the abduction, to which the children are being exposed. She is doubling down and adding concerns to orchestrate and drive home the *false* narrative that Father is an abuser and committed domestic violence, including to the children. Unfortunately, Father expects that Mother's story will continue to evolve and change in an effort to paint him in a negative light.

111.    The fact of the matter is that Father is not an abusive husband, and he certainly did not abuse the children.

112.    An argument can be made that allowing the children to remain in the United States with the parent who abducted them and severed their relationship with their other parent is what would constitute a grave risk of harm to these children.

113.    Unless this Court takes immediate action to bring Mother before the Court, irreparable harm will occur to the well-being of the children in that the children are being denied time with Father and are likely being alienated from him. The children are also being denied access to the home, education, and environment to which they are accustomed.

114.    Father requests an expedited trial, to be set as soon as possible on the Court's trial calendar, with expedited scheduling deadlines to be set accordingly. This is appropriate under Article 11 of The Convention and ICARA, which contemplates a decision being reached within six weeks from the date of commencement of the proceedings. Father contends that both parties have already gathered any expedited evidence—as hearings in both France and in Kentucky have already taken place—and, therefore, the parties could be ready for trial by the first week of January.

115.    For all of the foregoing reasons, the children should be returned to France forthwith.

## ATTORNEYS' FEES, COSTS, AND EXPENSES
## (THE CONVENTION ARTICLE 26 AND/OR 22 U.S.C.S. § 9007)

116.    Father will submit a copy of all expenditures incurred by him as a result of the wrongful removal and retention of the children by Respondent, including the fees and expenses he has incurred for his attorneys in the matter. 22 U.S.C.S. § 9007(b).

117.    Father will amend this list from time to time to include further expenditures required because of Mother's wrongful removal and retention of the children.

118.     Father requests that this Court award him all costs, fees, and expenses incurred by

him in connection with prosecuting this Petition, as required by 22 U.S.C.S. § 9007, and enter a

judgment against Mother for the same.

119.     Father further requests that the Court reserve jurisdiction to award any additional

fees, costs, and expenses incurred in connection with returning the children to France.

## RELIEF REQUESTED

Father respectfully requests the following relief:

(a)          That Mother be served with this Petition and be giving an expedited

deadline to respond to the same;

(b)          That this Court order an expedited and immediate trial, with waived or

limited discovery;

(c)          That this Court determine that the children have been wrongfully removed

and retained by the Mother within the meaning of The Convention and/or 22 U.S.C.S. § 9001, *et

seq*.;

(d)          That this Court find that Mother cannot meet her burden of proving any

affirmative defense contemplated by The Convention;

(e)          That the Court issue an order requiring the children to be expeditiously

returned to their habitual residence of France, and that the return of the children shall be forthwith

pursuant to Article 12 of The Convention;

(f)          That this Court issue an immediate order restraining and enjoining Mother

from taking the children outside of Monroe County, Kentucky and the counties that immediately

surround Monroe County, pending determination of this Petition;[11]

(g)        That this Court order the children's passports to remain in the custody of the Monroe County Clerk until further order of *this Court* or order of the Monroe County court releasing the passports *only* to Father or his agents*;*

(h)        That this Court issue an order staying any other proceedings in the Kentucky court pertaining to the custody of the children, other than Father's Motion to Dismiss and Motion to Enforce;

(i)        That this Court issue an order staying any other proceedings in any other state or federal court in the United States pertaining to the custody of the children, pending resolution of this Petition;

(j)        That this Court, pursuant to 22 U.S.C.S. § 9003(c), direct that Mother shall be given notice of this Petition pursuant to the Court Rules;

(k)        That this Court issue an order and judgment, pursuant to 22 U.S.C.S. § 9007, directing Mother to pay Petitioner for all costs, expenses, and fees, including attorneys' fees, incurred in connection with prosecuting this Petition and/or returning the children to France;

(l)        That while this action is pending, this Court issue an order allowing Father access to the children, to include in-person visits when possible as well as regular FaceTime or Zoom and telephone contact; and

(m)        That this Court grant such other and further relief as this Court may deem appropriate.

---

[11] This request is appropriate pursuant to 22 U.S.C.S. § 9004.

Respectfully submitted,


*s/ Chadwick A. McTighe*

Chadwick A. McTighe (KY Bar No. 90450)
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202-3352
Phone: (502) 587-3400
Email: cmctighe@stites.com

*Local counsel for Petitioner,*
*Flavien Michel Claude Perigaud*


Ashley Goins Alderson (BPR# 034253)
Rebecca McKelvey Castañeda (BPR# 5562)
STITES & HARBISON PLLC
401 Commerce St., Suite 800
Nashville, TN 37219
Phone: (615)-782-2200
Email: agoins@stites.com
       rebecca.mckelvey@stites.com

*Counsel for Petitioner, Flavien Michel*
*Claude Perigaud*

*Pro Hac Vice Motions will be promptly filed*

## DECLARATION

I, **FLAVIEN PÉRIGAUD**, pursuant to 28 U.S.C. § 1746, solemnly declare and affirm under the penalties of perjury and the laws of the United States of America, that the content of the foregoing Petition is true and correct to the best of my knowledge, information, and belief.

December 13th 2023
Date

FLAVIEN PÉRIGAUD